# Attachment A

## Special Agent Schifini
## Search Warrant Application

## CONTINUATION OF APPLICATION FOR SEARCH WARRANT

Based on my knowledge, training and experience, and the investigation of law enforcement officers with personal knowledge and with whom I am working, I, Thomas Schifini, being duly sworn, depose and state as follows:

### PRELIMINARY BACKGROUND INFORMATION

1.    This continuation supports the application for four warrants under Federal Rule of Criminal Procedure 41 to search:

    a.  **SUBJECT PREMISES**: a residence located at ▮ Laurel Street SW, Grand Rapids, Michigan 49503, as more fully described in Attachment A-1, which is believed to be the residence of Rigoberto VASQUEZ-Vasquez.

    b.  **SUBJECT VEHICLE**: A black 2009 Toyota Sienna minivan (VIN: 5TDZK23C39S248269) bearing Michigan license plate "DPT130", as more fully described in Attachment A-2 which is driven and utilized by Rigoberto VASQUEZ-Vasquez.

    c.  **SUBJECT CELLPHONE**: the cellular telephone of Rigoberto VASQUEZ-Vasquez, which is assigned telephone number ▮ and is more fully described in Attachment A-3.

2.    Based on the facts set forth in this continuation, there is probable cause to believe that violations of Title 18 United States Code § 1028(a)(2) (unlawful transfer of a document) have been committed, are being committed, and will be committed by Rigoberto VASQUEZ-Vasquez and other individuals. There is also probable cause to believe that evidence of the listed violations will be located within the **SUBJECT PREMISES, the SUBJECT VEHICLE**, and the **SUBJECT CELLPHONE**.

3.    I am a Special Agent with Homeland Security Investigations ("HSI"), assigned to

1

the Assistant Special Agent in Charge, Grand Rapids, Michigan. I have been a duly sworn federal agent since August of 1998. I graduated from John Jay College of Criminal Justice with a bachelor's degree in criminal justice. I also earned a Juris Doctor (JD) from the University of Akron School of Law. I graduated the U.S. Border Patrol Academy in December of 1998.

4.      As part of my duties, I have led and participated in numerous investigations relating to trafficking in false identification documents. Additionally, I have been involved in all aspects of criminal investigations including surveillance, undercover operations, and I am authorized to serve search and arrest warrants. I have also received specialized training in the areas of immigration law and fraudulent government-issued identification documents. Through my training and experience, I am familiar with common methods of investigating fraudulent document trafficking organizations, and have become familiar with document traffickers' methods of operation including, but not limited to: their methods of advertising, communicating with potential customers, communicating with 'runners' who are also called sales and delivery personnel; their methods of transporting and distributing false identification documents; their use of electronic communications, primarily cellular phones; their use of code words, encryption, counter-surveillance, and other methods of avoiding law enforcement detection.

5.      This affidavit is intended to show that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of this matter.

6.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

2

## PROBABLE CAUSE

### A. Summary and Introduction

7.    In March of 2024, HSI Grand Rapids received information regarding a West-Michigan based fraudulent document ring. The information indicated that a Hispanic female, who was identified as 'Norma', takes the orders for sets of fraudulent identification documents. 'Norma' then contacts an unidentified Guatemalan male, who also resides in the Grand Rapids area. That unidentified male manufactures the documents, which are provided to 'Norma'. 'Norma' then collects $350.00 for each set from the buyers. HSI Grand Rapids initiated an investigation in order to attempt to corroborate this information.

8.    On March 23, 2024, I was able to locate a Facebook page associated with 'Norma'. The Facebook page, which was open for public perusal, indicated that she lived in Wyoming, Michigan. There were multiple self-pictures exhibited on this Facebook account, which was under the username of Norma AYALA. I forwarded one of these pictures to the original Source of Information (SOI), who confirmed that this was the same person selling fraudulent identification documents.

9.    On May 23, 2024, I processed the name Norma AYALA and search-term 'Wyoming, Michigan' through various investigative databases available to HSI. One database showed a potential match of Norma Yanari AYALA, who resided at ███ Wyoming Avenue SW in Wyoming, Michigan as of January of 2023.

10.    I then processed the name of Norma Yanari AYALA through other investigative databases. One database associated this information with Norma AYALA (dob: xx-xx-1991). AYALA, a native and citizen of Guatemala, was issued alien number Axxx xxx 225 and FBI number 286854CE2 after being deported back to Guatemala on four (4) separate occasions. On May 23, 2024, I queried these additional identifiers through the EAGLE processing database.

3

00000756

The EAGLE database contained multiple facial images of AYALA taken from her deportations from 2014 through 2018. Those images appear to match the images of AYALA found on her Facebook page.

## B. Controlled Purchases from Norma AYALA

11.     HSI Grand Rapids conducted four (4) separate controlled purchases of fraudulent documents from Norma AYALA. The transactions occurred in the same manner and general location within Kent County, Michigan. A Confidential Informant (CI) would contact AYALA via WhatsApp or directly on her cellular telephone at                     . The CI would then send a photographic image and fictitious biographical data to AYALA, which I previously supplied to the CI. The CI would then meet with AYALA to exchange HSI funds for the fraudulent documents.

12.     On June 6, 2024, HSI Grand Rapids purchased a set of fraudulent documents from AYALA, with the assistance of a HSI CI. The set, which costs $350, consisted of a fraudulent lawful permanent resident card and Social Security card.



June 6, 2024 purchased documents

13.     On August 7, 2024, a second controlled purchase of fraudulent documents from Norma AYALA was completed. A HSI CI paid her $350 in exchange for another set of fraudulent documents, which consisted of a fraudulent lawful permanent resident card and Social Security

4

card.



August 7, 2024 purchased documents

14.     On August 14, 2024, at approximately 10:53 am (EST), I obtained and served an order for a pen register/trap and trace for WhatsApp, for               . The order (ref. 1:24-mc-00085-SJB) was submitted by Assistant U.S. Attorney Donald Daniels and signed by the Honorable U.S. Magistrate Judge Sally J. Berens of the U.S. District Court for the Western District of Michigan.

15.     On September 17, 2024, I analyzed information from the ongoing trap and trace on AYALA's WhatsApp account. I reviewed two (2) lists developed from AYALA's WhatsApp activity: WhatsApp frequent contact list and a WhatsApp report. Both reports cover the period from September 6, 2024 to September 13, 2024.

16.     I processed the top ten (10) contacts that AYALA communicated with on WhatsApp. I attempted to identify the people that were identified with those phone numbers. Any identifiers were processed through multiple other databases available to HSI. I was able to possibly identify the majority of the people with whom AYALA was communicating on WhatsApp during this small time frame.

17.     From September 6, 2024, to September 10, 2024, AYALA communicated with one (1) number on eight (8) occasions. This number made up 3.3% of her WhatsApp communications

5

during this time period. That phone number was identified as ▮▮▮▮▮▮ (the **SUBJECT CELLPHONE**). I processed this phone number through various databases in order to identify the end user.

18.     The HSI ICM case management database indicated that SA Daniel Gwyn (ret) received information in April of 2021 regarding multiple fraudulent document vendors. The information (GP18BR21GP0003 ROI 1) indicated that the document vendor was identified as 'Rigoberto' and was Guatemalan. 'Rigoberto' only communicated via WhatsApp through two (2) phone numbers: the **SUBJECT CELLPHONE** and ▮▮▮▮▮▮. In 2021, he was charging $250-$300 for fraudulent lawful permanent resident card and a fake Social Security card.

19.     T-Mobile was the identified service provider for the **SUBJECT CELLPHONE**. In 2021, SA Gwyn served a HSI subpoena on T-Mobile regarding the **SUBJECT CELLPHONE** number associated with 'Rigoberto'. T-Mobile responded with additional phone identifiers, detailed called records, and the following:

    a.  Phone Number: ▮▮▮▮▮▮ **(the SUBJECT CELLPHONE)**

    b.  Subscriber & Account Name: Rigoberto VASQUEZ

    c.  Address: ▮ Shamrock Street SW, Grand Rapids, MI. 49503-8103

    d.  Account Number ▮▮▮▮▮

20.     I then determined, from multiple online sources, that his full last name is VASQUEZ-Vasquez and processed the name of Rigoberto VASQUEZ-Vasquez through multiple other investigative databases available to HSI. VASQUEZ-Vasquez was now associated with ▮ Laurel Street SW in Grand Rapids, Michigan (the **SUBJECT PREMISES**) as of November 2023. VASQUEZ-Vasquez was previously associated with ▮ Shamrock Street SW in Grand Rapids, which corroborated the information previously gathered by SA Gwyn.

6

21.    I then reviewed Facebook for any user accounts associated with Rigoberto VASQUEZ-Vasquez. One (1) account was located, which was being utilized under the username of Rigoberto VASQUEZ-Vasquez. Facebook also showed his 'Facebook friends' list, which was open for public perusal, and indicated that he was 'Facebook friends' with Norma AYALA.

22.    The account, which was open for public perusal, contained multiple purported photographs of Rigoberto VASQUEZ-Vasquez. Multiple postings indicated that he worked as a photographer/videographer. Facebook also indicated that a company called Producciones R Vasquez was associated with Rigoberto VASQUEZ-Vasquez. The company, which had its own Facebook page, purports to offer 'fotografica' (photography) and 'videografica' (videography) services in the West Michigan area. The company advertises its phone number as the **SUBJECT CELLPHONE**. The Facebook page has a link to its YouTube page, which contains videos showing Rigoberto VASQUEZ-Vasquez. The last public posting on Facebook was approximately September 7, 2025.



23.    On September 23, 2024, I served a HSI subpoena on T-Mobile requesting updated records associated with the **SUBJECT CELLPHONE**. T-Mobile subsequently responded and provided the following information:

    a.    Customer Number:        (the **SUBJECT CELLPHONE**)

7

b. Customer Name: Anthony Vargas

c. Customer Address: ▮ Shamrock Street SW, Grand Rapids, MI.

24.    Based on my experience and training in conducting investigations targeting

fraudulent document rings, document vendors often use fictitious or misleading information in

order to evade detection by law enforcement. In many instances, a document vendor will often

register a cell phone in another person's name and/or address so that their illicit activities are less

traceable and provides some anonymity.

25.    On November 22, 2024, HSI Grand Rapids conducted the third controlled purchase

of documents from Norma AYALA. Norma AYALA met with a HSI CI in order to exchange

$350 for another set of fraudulent identification documents.



November 22, 2024 purchased documents

26.    On March 27, 2025, HSI Grand Rapids conducted a fourth controlled purchase of

fraudulent identification documents from Norma AYALA. AYALA met with the HSI CI at a

pre-arranged location in Wyoming, Michigan. The CI paid AYALA with $350 in HSI funds and

AYALA provided the CI with another set of fraudulent identification documents.

8



March 27, 2025 purchased documents

27.    On January 17, 2025, I forwarded a HSI subpoena to Meta Platforms (d/b/a

Facebook) requesting additional information associated with Rigoberto VASQUEZ-Vasquez'

Facebook account 100063404718537. Meta Platforms subsequently responded and provided the

following information:

    a.  Account: 100063404718537

    b.  Name: Rigoberto VASQUEZ-Vasquez (100063404718537)

    c.  Registration Date: 2021-01-30 16:58:07 UTC

    d.  Registration Ip: 2607:fb90:88b2:8ba9:b5a3:be65:6630:fc5

    e.  Phone Numbers:        (the **SUBJECT CELLPHONE**) Cell Verified on
        2021-01-30 16:58:01 UTC

28.    On February 27, 2025, I requested and obtained a federal search warrant for Apple

iCloud information associated with Rigoberto VASQUEZ-Vasquez' account (1:25-mj-107). The

search warrant was issued out of the Western District of Michigan and authorized by U.S. Magistrate

Judge Phillip Green. Apple, Inc. subsequently responded and provided the following information

associated with the Apple account holder:

    a.  Name: Rigoberto VASQUEZ

    b.  Address:   Laurel St SW, Grand Rapids, MI. 49503-4923 (the **SUBJECT
        PREMISES**)

9

    c. Day Phone: ███████████ verified) (the **SUBJECT CELLPHONE**)

    d. Apple ID ███████████████████

    e. DS ID: 20386633057

    f. Account Status: active

    g. iCloud Account Creation Date: Aug. 15, 2021 at 16:40 (PT)

    h. Apple ID Creation Date: Aug. 15, 2021 at 16:40 (PT)

## C.   First Controlled Purchase from Rigoberto VASQUEZ-Vasquez

29.     On May 8, 2025, I contacted another CI (herein referred to as CI #2) and requested that they communicate with Rigoberto VASQUEZ-Vasquez, via WhatsApp at the **SUBJECT CELLPHONE**, in order to arrange for the sale of fraudulent documents. I forwarded a facial picture and biographical data to CI #2, with a request that CI #2 contact Rigoberto VASQUEZ-Vasquez at the **SUBJECT CELLPHONE** and send the information to him in order to request a set of fraudulent documents. CI #2 then called the **SUBJECT CELLPHONE** in order to confirm with VASQUEZ-Vasquez that the documents would be ready for pickup later that afternoon. VASQUEZ-Vasquez stated that they would be completed and the cost for a set of fraudulent documents would be $250.00.

30.     VASQUEZ-Vasquez could not deliver the documents on May 8[th,] and the controlled purchase was rescheduled for the following day. On May 9, 2025, HSI Grand Rapids conducted the first controlled purchase of fraudulent documents. CI #2 was provided with covert recording equipment and $250 in pre-recording HSI funds. Arrangements had been made previously made to meet at a business off of Division Avenue South in Grand Rapids, Michigan.

31.     At 11:15 am, surveillance units saw and heard CI #2 make contact with a Hispanic male driving a gold-colored GMC Terrain SUV. The deal ended by 11:16 and surveillance units followed CI #2 back to the original staging location. CI #2 stated that the driver told CI #2 that he

10

was delivering the documents for the 'other guy,' who could not make it. The driver provided a small brown envelope, which contained the previously ordered fraudulent lawful permanent resident card and Social Security card. Rigoberto VASQUEZ-Vasquez then called CI #2 from the **SUBJECT CELLPHONE** to ensure that the delivery person provided the documents.



First Purchase of Documents from Rigoberto VASQUEZ-Vasquez

## D. Second Controlled Purchase from Rigoberto VASQUEZ-Vasquez

32.     On June 3, 2025, I requested that CI #2 contact Rigoberto VASQUEZ-Vasquez at the **SUBJECT CELLPHONE** to order an additional set of fraudulent identification documents. Rigoberto VASQUEZ-Vasquez responded in the affirmative and indicated that he would be able to manufacture an additional set of fraudulent documents. I forwarded a photograph and fictitious biographical data to CI #2, with a request to forward it to Rigoberto VASQUEZ-Vasquez at the **SUBJECT CELLPHONE.**

33.     On June 7, 2025, HSI Grand Rapids conducted the second controlled purchase of fraudulent documents from Rigoberto VASQUEZ-Vasquez. Arrangements had previously been made to meet at a business location off of Division Avenue South in Grand Rapids, Michigan. At approximately 9:40 am, VASQUEZ-Vasquez called CI #2 from the **SUBJECT CELLPHONE** and stated that he would be arriving shortly. At 10:00 am, surveillance units saw a black minivan

11

(the **SUBJECT VEHICLE**) leaving from ████ Laurel Street in Grand Rapids. The driver appeared to match the physical description of Rigoberto VASQUEZ-Vasquez.

34.     At 10:11 am, HSI surveillance saw and heard CI #2 make contact with Rigoberto VASQUEZ-Vasquez. It appeared that VASQUEZ-Vasquez arrived at the meeting location on foot. Surveillance agents saw CI #2 meet with a Hispanic male, who appeared to match the photographic images of Rigoberto VASQUEZ-Vasquez. He was wearing a maroon long sleeve shirt and black pants, which matched those seen by surveillance units at the **SUBJECT PREMISES** in Grand Rapids. The deal appeared to end by 10:13 am. Surveillance followed CI #2 out of the area, while other HSI personnel watched VASQUEZ-Vasquez. VASQUEZ-Vasquez walked away from the meeting location and then sprinted back across the parking lot to meet with the waiting **SUBJECT VEHICLE**. He entered the driver's seat of the van and quickly departed the area.



Rigoberto VASQUEZ-Vasquez maroon shirt & black pants

35.     CI #2 was immediately debriefed following the transaction. CI #2 relayed a brown envelope containing a fraudulent lawful permanent resident card and Social Security card, which were provided by Rigoberto VASQUEZ-Vasquez. The brown envelopes match the ones provided by Norma AYALA during previous controlled purchases. Shortly after the transaction was

12

completed, VASQUEZ-Vasquez called CI #2 to thank them for the business and requested to be considered for future transactions.



Second Purchase of Documents from Rigoberto VASQUEZ-Vasquez

## E.    Third Controlled Purchase from Rigoberto VASQUEZ-Vasquez

36.    On June 26, 2025, HSI Grand Rapids conducted the third controlled purchase of fraudulent documents from Rigoberto VASQUEZ-Vasquez. Arrangements had previously been made to meet at a business location off of Division Avenue South in Grand Rapids, Michigan. CI#2 contacted VASQUEZ-Vasquez at the **SUBJECT CELLPHONE**. As on prior occasions, CI#2 sent a passport-style photograph and fictitious biographical data to VASQUEZ-Vasquez, which I had previously sent to CI#2.

37.    At 4:33 pm, I was able to monitor a covert video surveillance lead at the **SUBJECT PREMISES**. I saw the **SUBJECT VEHICLE**, which was used during the previous controlled purchase of documents from VASQUEZ-Vasquez. The **SUBJECT VEHICLE** was parked directly in front of the **SUBJECT PREMISES**. At 4:22 pm, I saw a Hispanic male fitting the physical description of Rigoberto VASQUEZ-Vasquez. The male was wearing a gray sleeveless t-shirt and blue shorts. He entered the driver's side of the **SUBJECT VEHICLE** and departed the **SUBJECT PREMISES**. CI#2 then received a call from VASQUEZ-Vasquez from the **SUBJECT CELLPHONE**, which indicated he would be arriving within two minutes.

38.    At 4:45 pm, I saw VASQUEZ-Vasquez arrive at the meeting location on foot and wearing the same clothes as seen on the covert video recording from the **SUBJECT PREMISES**.

13

00000766

VASQUEZ-Vasquez was seen walking directly up to CI#2 and conducting a brief transaction. Both subjects then departed the area. Agents saw VASQUEZ-Vasquez meeting with another vehicle on the adjacent street, where he appeared to be conducting another transaction. VASQUEZ-Vasquez could be seen speaking with someone through the passenger side window of the vehicle. HSI agents terminated the surveillance shortly after.

39.     Surveillance units followed CI#2 out of the area and back to the original preparation location, where I conducted a debrief. CI#2 relayed a brown envelope, which contained a fraudulent lawful permanent resident card and Social Security card. CI#2 stated that VASQUEZ-Vasquez walked right up and handed the documents, which he took out of his pocket. CI#2 then paid VASQUEZ-Vasquez with $250 in HSI funds.



Third Purchase of Documents from Rigoberto VASQUEZ-Vasquez

## D.    **Cellphone Ping Search Warrant**

40.     On July 15, 2025, SA Schifini requested and obtained a 'ping' search warrant from the U.S. District Court for the Western District of Michigan. The search warrants were authorized by U.S. Magistrate Judge Phillip Green and allowed investigators to 'ping' the **SUBJECT CELLPHONE** (1:25-MJ-358). The original search warrant was forwarded to T-Mobile, who subsequently responded and stated that Verizon Wireless was now the company providing services to the **SUBJECT CELLPHONE**.

14

41.     HSI Criminal Analyst (CA) Farina subsequently analyzed the ping locations associated with the **SUBJECT CELLPHONE**. On August 18, 2025, I received an e-mail from CA Farina regarding the towers being utilized by the **SUBJECT CELLPHONE**. The **SUBJECT CELLPHONE** generally hit off the same tower location during the hours from 3:00 pm to approximately 5:00 am the next morning. An example of this occurred on July 30, 2025, at approximately 1:03 am (eastern), which placed the **SUBJECT CELLPHONE** within 443 meters of the intersection of Martin Luther King Jr. Street and US-131. It should be noted that Rigoberto VASQUEZ-Vasquez is believed to reside at the **SUBJECT PREMISES**, which is close to this location. This is based on prior surveillance, which places **VASQUEZ-Vasquez** and the **SUBJECT VEHICLE** at this residence.

## TRAINING & EXPERIENCE REGARDING DOCUMENT TRAFFICKING

42.     I know from training and experience that fraudulent document traffickers frequently utilize cellular phones to facilitate transactions. Document traffickers rely upon voice services, SMS and MMS text messaging, social media instant messaging services, and electronic mail apps to communicate with customers, sales and delivery persons. Cellular phones are portable, and phone providers often do not require purchasers or users of the devices to provide their true names and/or addresses, so document traffickers often maintain multiple devices to avoid detection by law enforcement. Cellular phones often contain evidence indicative of document trafficking, including records of incoming and outgoing calls; text messages; photographs of customers, customer's biographical data, card prices, and meeting locations; and, in the case of "smart phones," Global Positioning System ("GPS") data indicating the location of the device at given points in time.

43.     Additionally, based on my aforementioned training and experience, I am familiar

15

with the modus operandi of persons involved in the illicit distribution of fraudulent identification documents and as a result, know the following:

    A.    It is common practice for document traffickers to hide their addresses, their telephone numbers and cellular services by using other person's names in order to avoid detection by law enforcement officials.

    B.    It is common for document traffickers to maintain the same cellular telephone number over long periods of time. This helps ensure that customers are aware of which number to call if any relatives, friends, or co-workers subsequently need to purchase fraudulent documents at a later date.

    C.    It is common for document traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

    D.    Document traffickers commonly utilize sales and delivery people to assist in their illicit transactions. The salespeople generate potential business by handing out business cards that contain the document manufacturer's phone number but appear to be selling painting or construction services. The business cards are handed out at Hispanic stores, markets, festivals, or restaurants, which may cater to undocumented immigrants.

    E.    Document manufacturers often utilize delivery people in order to avoid potentially revealing their actual identities. The delivery and salespeople often get a cut of the proceeds, or they may charge extra money during delivery of the documents, which they then earn as profit.

    F.    Evidence of past communication between document traffickers, customers, sales and delivery persons can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone and/or computer.

## TECHNICAL TERMS

16

45.     Based on my training and experience, I use the following technical terms to convey the following meanings:

A.      Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include the following: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

B.      Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

17

C.        Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

D.        GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

E.        PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a

18

memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

F.      Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit access to the Web, sending and receiving e-mail, and participating in Internet social networks.

G.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static, that is, long-term—IP addresses, while other computers have dynamic, that is, frequently changed—IP addresses.

H.      Internet: The Internet is a global network of computers and other

19

electronic devices that communicate with each other. Due to the structure of the Internet,
connections between devices on the Internet often cross state and international borders,
even when the devices communicating with each other are in the same state.

46.    Based on my training, experience, and research, I know **SUBJECT**

**CELLPHONE**, and other cellular telephone devices, have capabilities that allow them to serve
as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.
In my training and experience, examining data stored on devices of this type can uncover, among
other things, evidence that reveals or suggests who possessed or used the device.

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

47.    Based on the information above, I expect to find **SUBJECT CELLPHONE** and
other cellphones used by Rigoberto VASQUEZ-Vasquez, during a search of the **SUBJECT**
**PREMISES** and/or the **SUBJECT VEHICLE**.

48.    I submit that if **SUBJECT CELLPHONE** is found on the **SUBJECT**
**PREMISES**, in the **SUBJECT VEHICLE**, or on the person of Rigoberto VASQUEZ-Vasquez,
there is probable cause to believe pertinent records and other relevant evidence will be stored on
those devices, for the reasons stated above as well as the following additional reasons:

A.    Based on my knowledge, training, and experience, I know that computer
files or remnants of such files can be recovered months or even years after they have been
downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files
downloaded to a storage medium can be stored for years at little or no cost. Even when
files have been deleted, they can be recovered months or years later using forensic tools.
This is so because when a person "deletes" a file on a computer, the data contained in the
file does not actually disappear; rather, that data remains on the storage medium until it is
overwritten by new data.

20

B.          Therefore, deleted files, or remnants of deleted files, may reside in free
space or slack space—that is, in space on the storage medium that is not currently being
used by an active file—for long periods of time before they are overwritten. In addition, a
computer's operating system may also keep a record of deleted data in a "swap" or
"recovery" file.

C.          Wholly apart from user-generated files, computer storage media—in
particular, computers' internal hard drives—contain electronic evidence of how a
computer has been used, what it has been used for, and who has used it. To give a few
examples, this forensic evidence can take the form of operating system configurations,
artifacts from operating system or application operation, file system data structures, and
virtual memory "swap" or paging files. Computer users typically do not erase or delete
this evidence, because special software is typically required for that task. However, it is
technically possible to delete this information.

D.          Similarly, files that have been viewed via the Internet are sometimes
automatically downloaded into a temporary Internet directory or "cache."

E.          Forensic evidence. As further described in Attachment B, this application
seeks permission to locate not only electronically stored information that might serve as
direct evidence of the crimes described on the warrant, but also forensic evidence that the
Subject Devices were used, the purpose of their use, who used them, and when. There is
probable cause to believe that this forensic electronic evidence might be on the Subject
Devices because:

F.          Data on the storage medium can provide evidence of a file that was once
on the storage medium but has since been deleted or edited, or of a deleted portion of a
file (such as a paragraph that has been deleted from a word processing file). Virtual

21

memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

G.        Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

H.        A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

I.        The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

J.        Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is

22

not present on a storage medium.

49.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **SUBJECT CELLPHONE** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **SUBJECT CELLPHONE** because:

A.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

B.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

D.    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

23

E.       Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

50.      Nature *of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

51.      Based on the investigation, I have probable cause to believe that violations of Title 18 United States Code § 1028(a)(2) (unlawful transfer of a document); have been committed, are being committed, and will be committed by Rigoberto VASQUEZ-Vasquez and other individuals. There is also probable cause to believe that evidence of the listed violations will be located within the **SUBJECT PREMISES,** the **SUBJECT VEHICLE**, and the **SUBJECT CELLPHONE**. Information described in Attachment B will constitute evidence of these criminal violations, will lead to the identification of individuals who are engaged in the commission of these offenses, and can be expected to be found within the **SUBJECT PREMISES, SUBJECT VEHICLE**, and/or **SUBJECT CELLPHONE**.

52.      I am requesting the court's permission to execute this search warrant before 6:00 am as the main suspect, Rigoberto VASQUEZ-Vasquez, departs for work at approximately 5:00 am each morning. Repeated surveillance has shown that VASQUEZ-Vasquez has been seen departing the residence, while utilizing multiple vehicles associated with the Subject Premises. The opportunity to execute the search warrant before 6:00 am will enable investigators to safely and effectively locate and arrest VASQUEZ-Vasquez, while securing any potential

24

evidence in the Subject Premises.

53. I respectfully request that the Court order that all papers in support of this application, including this continuation and the requested order, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known in its entirety to the targets of the investigation. Premature disclosure may have a significant and negative impact on the continuing investigation and may interfere with law enforcement efforts to gather evidence and enforce the warrant. Accordingly, there is good cause to seal these documents because their premature disclosure may give the targets an opportunity to flee from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.